UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
:
YULI ONRUST,                                          :
:
                              Petitioner,             :
:
                    -v-                               :
:
RICHARD LARSON,                                       :
:
                              Respondent.             :
:
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____11/10/15__

15 Civ. 122 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion seeking the shifting of attorneys' fees and expenses

following the settlement of a case brought under the Hague Convention on the Civil Aspects of

International Child Abduction, Oct. 25, 1980, T.I.A.S. 11,670, 1343 U.N.T.S. 89 (the

"Convention" or "Hague Convention").

On January 8, 2015, petitioner Yuli Onrust filed suit in this Court, seeking the return of

her nine-year-old son, A.R.O., to Germany, under the Convention and its implementing

legislation, the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001–11 ("ICARA").

Onrust claimed that A.R.O.'s father, respondent Richard Larson, had retained A.R.O. in New

York past the date when Onrust and Larson had agreed he would return to Germany.  Larson

justified not returning A.R.O. on the ground that A.R.O. had reported to Larson instances of

alleged physical and psychological abuse of him by Onrust and her paramour in Germany, such

that Larson had a well-founded fear that such abuse would continue were A.R.O. to return.

Larson further noted that, several months before filing the lawsuit, Onrust had sent him an email,

stating that she wished to cede custody of A.R.O. to him.

After three months of expedited litigation in this Court, the parties, on the morning on which trial was to commence, voluntarily settled their dispute.  The Court thereafter entered a consent judgment order, memorializing the terms of their detailed agreement.  Under it, A.R.O., after completing his school year in New York, would return to Germany, and the parents would thereafter share custody of A.R.O. pursuant to an agreed schedule.

Pending now is Onrust's motion for attorneys' fees and necessary expenses, pursuant to the fee-shifting provision of the ICARA, 22 U.S.C. § 9007.  Larson opposes the motion, arguing that an award of legal fees is "clearly inappropriate" under the ICARA, and alternatively that Onrust's counsel's bills are excessive.  For the reasons set forth below, the Court denies Onrust's motion for an award of attorneys' fees and costs.

## I.    Background

In January 2015, Onrust petitioned under the Convention for the return of A.R.O. to Germany, where, she claimed, she and A.R.O. had resided prior to his travel to New York to visit his father, Larson.  Onrust alleged that Larson had kept A.R.O. in New York past the date when she and Larson had agreed he would return to his mother in Germany.

Out of respect for the priority that the Convention places on prompt resolution of claims of abduction, the Court, as detailed below, set a prompt discovery and trial schedule, and held a number of conferences to resolve disputes and organize trial.  The Court also appointed independent counsel for A.R.O., who actively participated in pretrial proceedings.  As a result of these conferences and the parties' submissions, which included motions *in limine*, expert reports, and pretrial briefs, the Court gained some insight into the tumultuous and troubled relationship between the married but separated parents, Onrust and Larson, and into the disquieting treatment of A.R.O. by Onrust and her German paramour, Joachim Peter.  Below, the Court first describes

the relevant history of Onrust, Larson, and A.R.O., and then reviews the procedural history of this case, including the terms of the day-of-trial settlement.

A.      **Factual Background**[1]

Onrust, a Dutch citizen who resides in Munich, Germany, and Larson, a United States citizen and New York resident, are the married parents of a child, A.R.O., who suffers from a mild form of Asperger's syndrome.

In late 2004 or early 2005, the parents met while Onrust was working on a cruise ship. Larson, at the time, was married to another woman.  Onrust thereafter became pregnant, and, later in 2005, gave birth to A.R.O. in Florida.  The parents lived together on and off in the United States, married in 2009, and permanently separated several months later.

In 2007, A.R.O. moved to Amsterdam, The Netherlands, with Onrust.  Since 2011, A.R.O., then age five, has been visiting Larson in New York City every year during the summer, except in 2013.[2]

On May 25, 2011, prior to A.R.O.'s first visit to New York, Larson, at Onrust's request, sent Onrust the following email:

> To Whom It May Concern:
>
> May this letter, signed and notarized suffice as contract [sic] between Yuli Onrust and Richard Larson.  In the matter of custodianship of our child, [A.R.O.], I give full authority to Yuli Onrust, and claim no contest now or forever.  In the event [A.R.O.] stays with Richard Larson for any length of time, Mr. Larson agrees to return [A.R.O.] to Yuli Onrust immediately or face legal charges or arrest.

---

[1] These facts are drawn from the factual allegations in Onrust's amended petition for relief, *see* Dkt. 7 ("Am. Pet."), from the parties' ensuing submissions (including evidentiary submissions) to the Court, from colloquy with the Court at conferences, and from the parties' pleadings and briefs on this motion.  Except where specifically referenced, no citation to these documents will be made.

[2] In 2014, A.R.O. visited Larson in the spring and the summer.

3

Richard Larson acknowledges that not returning [A.R.O.] to his mother, Yuli Onrust, would constitute kidnapping and be subjected [sic] to the laws that govern this charge.  Richard Larson acknowledges that Yuli Onrust is the sole guardian of [A.R.O.], and furthermore, Mr. Larson relinquishes any claim of guardianship for any reason now and forever, except at the discretion of Yuli Onrust.

Sincerely,

Richard Larson

In 2013, Onrust, while living in The Netherlands with A.R.O., met Peter, a German citizen.  She thereafter began a romantic relationship with Peter, and they eventually became engaged, though she was still married to Larson.  In September 2013, Onrust, along with A.R.O., moved in with Peter in Germany.

On July 28, 2014, before the 2014 summer visit, Onrust provided the following notarized letter to Larson and Yulia Kachalova, his live-in girlfriend:

Re: Temporary Guardianship of Minor Child, [A.R.O.]

From July 28, 2014 till September 10, 2014, Yuli Onrust gives temporary guardianship of her son, [A.R.O.], to Yulia Kachalova and Richard Robert Larson.  This Temporary Guardianship Letter will serve as a legal and binding document that will allow them to make any decisions regarding [A.R.O.] for this period.

Trusting in good faith, Yulia Kachalova and Richard Robert Larson, they allow temporary guardianship so they may make decisions regarding their child care [sic].  The address of the apartment that the child will reside in is 200 Riverside Blvd. 26E NY, New York NY 10069—USA.

/s/ Yuli Onrust.

On July 28, 2014, A.R.O., then age eight, went to New York City on vacation to visit Larson.  While in New York, A.R.O. revealed to Larson that Onrust and Peter had inflicted physical, emotional, and psychological abuse on him on multiple occasions.  Specifically, A.R.O. alleged that Onrust and Peter had abused him by, *inter alia*, whipping him with a belt, pulling his hair, calling him names, and degrading him for overeating.  A.R.O. also claimed that

4

Peter, at one point, had put A.R.O.'s head in a toilet that contained feces.  A.R.O. also claimed that, after being informed at least twice about Peter's physical abuse of him, Onrust declined to end her relationship with Peter.[3]

Because of A.R.O.'s reports of abuse by Onrust and Peter, Larson notified Onrust that he would not be sending A.R.O. back to Germany as scheduled because Larson feared for A.R.O.'s safety.  On September 8, 2014, Larson filed suit in New York Family Court to obtain legal custody of A.R.O.  On September 9, 2014, the Family Court, noting that it lacked subject matter jurisdiction, issued a *sua sponte* order, directing Larson to file suit for A.R.O.'s custody in Germany by September 17, 2014.[4]

On September 12, 2014, Onrust filed an application with the Hague Convention Central Authority in Germany, claiming that Larson was unlawfully retaining A.R.O. in the United States.

On October 4, 2014, Onrust sent an email to Larson (the "October 4 email").  In it, she stated the following:

> Mister Larson,
>
> [W]hat I want is to give up all my parental obligations concerning [A.R.O.].  I also want to see it black on wite [sic] that you cant [sic] come after me for child support or any other typr [sic] of payments consurning [sic] [A.R.O.].  You never paid why should i.

---

[3] Onrust ended her relationship with Peter only after Larson had indicated intent to retain A.R.O. in New York by citing the abuse that A.R.O. claimed to have experienced in Onrust's custody. Onrust testified in her deposition that she last communicated with Peter in late January 2015, *i.e.*, after this lawsuit had been initiated.

[4] Consistent with the Family Court's determination of lack of jurisdiction, on September 15, 2014, the United States Department of State ("State Department") sent a letter to the New York Family Court judge handling Larson's custody suit, stating that the Family Court lacked subject matter jurisdiction over A.R.O.'s custody.

[W]hat you send me makes you look good at the court, and tries to creat [sic] the impression that we are having a mutual agrement [sic].  [W]e are far from that, you took my child, and now [A.R.O.] doesnt [sic] want to come back, because of false acusments [sic].  I'm respecting now [A.R.O.'s] will, thats [sic] all.  So dont [sic] try to maak [sic] it look like as if it is my concent [sic] what is going on.  So, once again I did evrything [sic] you and him ask of me now. . . .

I expect you to change this agreement now in a way I said above, other wise the pettition [sic] I made will not be taken back.

On November 20, 2014, the New York Family Court issued an order, dismissing the custody proceeding without prejudice to Larson's filing a custody suit in Germany.

### B.    Procedural History

On January 8, 2015, Onrust filed a petition in this Court.  Dkt. 1. ("Pet.").  The next day, the Court issued an order to show cause, directing Larson to appear before the Court on January 20, 2015, and show cause why A.R.O. should not be repatriated to Germany on the grounds that (1) Larson had wrongfully retained A.R.O. in violation of Onrust's custody rights, and (2) Germany is A.R.O.'s state of habitual residence.  Dkt. 3.

On January 20, 2015, the Court held a show cause hearing with Larson, Larson's counsel, and Onrust's counsel.  At the conference, the Court inquired about the case, set various deadlines for pleadings, and sought counsel's input whether to appoint independent counsel for A.R.O. The Court also directed the parties to appear for a next conference on February 2, 2015.

On January 21, 2015, Onrust filed an amended petition, requesting, *inter alia*, that the Court direct that A.R.O. be repatriated to Germany forthwith, and award Onrust the costs and fees incurred from this action, pursuant to ICARA, 22 U.S.C. § 9007(b).  Dkt. 8 ("Am. Pet.").

The same day, Larson filed his answer to the amended petition, and raised a variety of affirmative defenses.  Dkt. 11.  He asserted that A.R.O.'s return to Germany would expose him to physical or psychological harm, noting A.R.O.'s reports of physical and mental abuse at the

6

hands of Onrust and her paramour, including beatings with a belt, grabbing A.R.O.'s neck, and putting his head in a toilet. *Id.* at 2. Larson also asserted that his retention of A.R.O. was not wrongful because Onrust had consented to the child's remaining in the United States with him, and that the parents shared equal custody rights. *Id.*

On January 30, 2015, the Court appointed three attorneys as A.R.O.'s independent counsel. Dkt. 13. On February 2, 2015, the Court held a pretrial conference with counsel for Onrust, Larson, and A.R.O., and scheduled a next pretrial conference for February 10, 2015.

On February 6, 2015, the parties submitted a joint letter to the Court, notifying the Court that the parties were attempting "to settle the present action, together with all related custody and access issues." Dkt. 19, at 1. In the letter, A.R.O., through his counsel, stated that he objected to repatriation to Germany because of the grave risk of harm he would face. *Id.* at 4.

On February 10, 2015, the Court held another pretrial conference, and directed the parties to submit a joint status letter by February 20, 2015. Dkt. 20. The Court also scheduled another pretrial conference for February 23, 2015, and notified the parties that trial in this case was likely to be held between March 30–April 24, 2015. *Id.*

On February 20, 2015, the Court received another update from the parties regarding the schedule for depositions in this case. Dkt. 21. The parties also notified the Court that they were still discussing a potential settlement. *Id.* at 3. On February 23, 2015, the Court held another status conference, and directed the parties to appear for a pretrial conference on March 23, 2015.

On March 23, 2015, the Court held a final pretrial conference. *See* 3/23/15 Tr. In reviewing the issues to be tried, based on the parties pretrial submissions, the Court noted that, unlike in many other cases brought under the Hague Convention, there was no custodial decree in place; instead, the parents had addressed A.R.O.'s custody and whereabouts informally among

themselves.  *Id.* at 13.  Therefore, the Court noted, among the issues to be resolved at trial was whether there was a parenting/custodial arrangement, recognized by the Hague Convention, that was violated.  *Id.*

The Court set a bench trial for April 6, 2015.  Dkt. 23.  However, on the morning of the first day of trial, prior to opening statements, the parties (including A.R.O. through his counsel) reached a settlement, the terms of which were memorialized in a written stipulation that the Court so-ordered.  In substance, the parties agreed that A.R.O. would remain with Larson in New York until June 28, 2015 (*i.e.*, after the conclusion of the New York school year), and that Larson would then voluntarily return him to Onrust in Germany.  Dkt. 47.  The stipulation further provided that, going forward, the parents would share custody of A.R.O, such that Onrust would have custody of A.R.O. during the school year, and Larson would have custody of A.R.O. for 75% of A.R.O.'s summer vacation.  *Id.* at 3.

The stipulation also prohibited Onrust from facilitating or permitting contact between A.R.O. and Peter, Onrust's former paramour, and from using any form of corporal punishment when disciplining A.R.O.  *Id.* at 4.  Larson, for his part, agreed to pay for various expenses. These included a private social worker to monitor A.R.O.'s safety and well-being in Germany. They also included obtaining, with the assistance of German counsel, formal recognition in Germany of the parties' custodial arrangement.  *Id.* at 4–6.

Relevant here, the stipulation provided:

> [Onrust's] claim for costs and fees in connection with the prosecution of this action, pursuant to ICARA, 22 U.S.C. § 9007(b), is reserved for future agreement of the parties or, if no such agreement can be reached, for determination by the court.

*Id.* at 6.

On July 9, 2015, after the parties failed to reach agreement as to this point, Onrust filed a

motion for attorneys' fees and costs, Dkt. 51, along with supporting documentation, Dkt. 52

("Segal Decl."), 53 ("Onrust Br.").  On July 24, 2015, Larson's counsel filed an affirmation in

opposition to this motion, Dkt. 59 ("Gayner Aff."), and a supporting affidavit from Larson, Dkt.

63 ("Larson Aff.").  On July 31, 2015, Onrust filed a reply, Dkt. 65 ("Onrust Reply Br."), and a

supporting affidavit by her counsel, Dkt. 64 ("Segal Aff.").

## II.      Applicable Legal Standards Relevant to the Hague Convention

### A.      Background Principles

The purpose of the Hague Convention is "to protect children internationally from the

harmful effects of their wrongful removal or retention and to establish procedures to ensure their

prompt return to the State of their habitual residence, as well as to secure protection for rights of

access."  Hague Convention, pmbl.; *accord Ozaltin v. Ozaltin*, 708 F.3d 355, 359 (2d Cir. 2013).

The Convention does so by "ensur[ing] that rights of custody and of access under the law of one

Contracting State are effectively respected in the other Contracting States," *Chafin v. Chafin*, 133

S. Ct. 1017, 1021 (2013) (quoting Hague Convention, art. 1), so that parents are "deter[red] from

crossing international boundaries in search of a more sympathetic court," *Blondin v. Dubois*

*(Blondin II)*, 189 F.3d 240, 246 (2d Cir. 1999) (citation omitted).  ICARA was passed in 1988 to

implement the Hague Convention in the United States.  *See Ozaltin*, 708 F.3d at 360.

The Convention allows a parent alleging breach of his or her custody rights to initiate a

proceeding to repatriate the child to the state of "habitual residence."  ICARA provides that

"[a]ny person seeking to initiate judicial proceedings under the Convention for the return of a

child or for arrangements for . . . securing the effective exercise of rights of access to a child may

do so by commencing a civil action by filing a petition for the relief sought in any court which

9

has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed."  22 U.S.C. § 9003(b).  Under the Convention, a removal is wrongful when "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention."  *Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005); *see* Hague Convention, art. 3 ("The removal or the retention of a child is to be considered wrongful where . . . it is in breach of rights of custody attributed to a person . . . , either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and . . . at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."); *see also Abbott v. Abbott*, 560 U.S. 1, 9 (2010) ("A removal is 'wrongful' where the child was removed in violation of 'rights of custody.'" (quoting Hague Convention, arts. 3, 5)).  ICARA places on the petitioning party the burden of proving by a preponderance of the evidence that a child's removal was wrongful.  22 U.S.C. § 9003(e).

A petitioner who has established wrongful removal by a preponderance of the evidence has made out a *prima facie* case under ICARA.  At that point, ICARA requires that the child be repatriated for custody proceedings unless the respondent can make out one of four "narrow" affirmative defenses.  22 U.S.C. §§ 9001, 9003; *Souratgar v. Lee*, 720 F.3d 96, 101–02 (2d Cir. 2013); *Blondin II*, 189 F.3d at 245.  These include that: (1) the proceeding was commenced more than a year after the child's removal and the child has become settled in his or her new environment, Hague Convention, art. 12; (2) the person seeking the child's return was not

exercising his or her custody rights at the time of removal or retention, or he or she consented to—or subsequently acquiesced in—the child's removal or retention, *id.*, art. 13(a); (3) returning the child poses a "grave risk" to his or her physical or psychological well-being or would place him or her "in an intolerable situation," *id.*, art. 13(b); or (4) the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," *id.*, art. 20.  The first and second affirmative defenses must be established by a preponderance of the evidence; the third and fourth must be established by clear and convincing evidence.  *See* 22 U.S.C. § 9003(e).  In addition, courts may consider a fifth affirmative defense:  "The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Hague Convention, art. 13; *see also Blondin v. Dubois* (*Blondin IV*), 238 F.3d 153, 166 (2d Cir. 2001) ("[T]he unnumbered provision of Article 13 provides a *separate* ground for repatriation and . . . a court may refuse repatriation *solely* on the basis of a considered objection to returning by a sufficiently mature child." (emphasis in original)).  Like the Article 12 defenses, this defense must be proven by a preponderance of the evidence.  *See* 22 U.S.C. § 9003(e).

Even where an affirmative defense has been established, it remains within the discretion of a court whether to allow the child to remain with the abducting parent or to order repatriation. *See Souratgar*, 720 F.3d at 102–03 ("[E]ven where the grounds for one of these 'narrow' exceptions have been established, the district court is not necessarily bound to allow the child to remain with the abducting parent." (quoting *Blondin II,* 189 F.3d at 246 n.4)).

11

**B.** **Standards Relevant to Requests for Fee- and Cost-Shifting**

The Hague Convention provides that, where a court orders the return of a child under the

Convention, the court:

> *may*, where appropriate, direct the person who removed or retained the child, or who prevented the exercise of rights of access, to pay necessary expenses incurred by or on behalf of the applicant, including travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child.

Hague Convention, art. 26 (emphasis added).  Under the ICARA:

> Any court ordering the return of a child pursuant to an action brought under section 9003 of this title *shall order* the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, *unless* the respondent establishes that such order would be *clearly inappropriate*.

22 U.S.C. § 9007(b) (emphasis added).

The Second Circuit has held that "a prevailing petitioner in a return action is

presumptively entitled to necessary costs, subject to the application of equitable principles by the

district court."  *Ozaltin*, 703 F.3d at 375; *see also id.* ("We . . . read the statute as giving the

district court broad discretion in its effort to comply with the Hague Convention consistently

with our own laws and standards.") (quoting *Whallon v. Lynn*, 356 F.3d 138, 140 (1st Cir.

2004)).

**III.** **Discussion**

Onrust seeks $139,486.55 for the work of the law firm of Segal & Greenberg LLP, which

represented her in this action.  This sum is comprised of (1) $132,933.60 of attorneys' fees and

related litigation costs; (2) $4,000 of fees for Onrust's German legal expert, Reinhard Humburg;

(3) $1,800 for the parties' jointly retained psychiatric expert, Dr. Richard G. Dudley, Jr.; and (4)

$752.95 for Onrust's airfare to New York to attend the April 6, 2015 court conference, during

which the parties formally reached a settlement.[5]  Onrust argues that, although she did not

prevail in a trial, she is a "prevailing party" and therefore should be awarded fees and expenses

because the Court, by approving the stipulated settlement terms and consent judgment, ordered

A.R.O.'s return to Germany.  Onrust Br. 3–4.  Onrust is correct that to be a prevailing party

under ICARA, a party need not win at trial or summary judgment—a consent decree can suffice.

*See Salazar v. Maimon*, 750 F.3d 514, 521–22 (5th Cir. 2014) ("Nothing in [ICARA] conditions

the court's obligations to award fees on a trial on the merits or upon a judicial determination that

[a parent] wrongfully retained the child within the United States. . . .  Accordingly, we find [that

a consent decree in a Hague action is] sufficient to create a duty on the district court to order an

award of necessary fees and expenses under section [9007(b)(3)].")

    Larson does not dispute that Onrust is a prevailing party, insofar as the Court's entry of

the consent judgment negotiated by the parties has secured A.R.O.'s return.  But, Larson argues,

on the facts, an award of fees to Onrust here would be clearly inappropriate.  He alternatively

argues that if such an award were appropriate, that the fees she requests from him are excessive,

and he has limited ability to pay any such award.

    The Court accordingly considers whether such an award would be clearly inappropriate.

"An award of fees and costs is 'appropriate' when the case is not a 'difficult' one and 'falls

squarely within the heartland of the Hague Convention.'"  *Rehder v. Rehder*, No. 14 Civ. 1242

(RAJ), 2015 WL 4624030, at *2 (W.D. Wash. Aug. 3, 2015) (quoting *Cuellar v. Joyce*, 603 F.3d

---

[5] In Onrust's opening brief for fees, she also requested $491.53 for translation costs.  Onrust Br.
2; Segal Reply Decl. 11.  That application is moot, because, on July 16, 2015, the Court, after a
conference that day, directed Larson to pay $491.53 to Onrust for translation costs, as required
under the consent decree.  Dkt. 56.  On July 31, 2015, Larson reimbursed Onrust for the
translation costs, Dkt. 66, and Onrust thereafter dropped this request.  *See* Onrust Reply Decl. 11.
    The Court also notes that Onrust, in recalculating her fee request, now requests
$139,487.08.  *Id.*  However, that calculation is incorrect; her attorneys' fees and costs,
enumerated above, total $139,486.55.

1142, 1143 (9th Cir. 2010)).  Courts considering such awards have, however, recognized various contexts in which shifting fees and costs from a petitioner onto a respondent would be clearly inappropriate.  Having reviewed this authority, the Court finds three decisions involving such requests in Hague Convention cases particularly instructive in light of the circumstances here—*Ozaltin*, 708 F.3d 355; *Madrigal v. Tellez*, No. 15 Civ. 181 (KC), 2015 WL 5174076 (W.D. Tex. Sept. 2, 2015); and *Rehder*, 2015 WL 4624030.  In each case, although ordering the return of the children to the petitioner, the deciding court denied the petitioner's motion for fees and costs, for reasons that have resonance here.

In *Ozaltin*, the Second Circuit affirmed a lower court order returning children to Turkey, but vacated the award of all necessary expenses.  708 F.3d at 357.  In that case, the parents, dual citizens of Turkey and the United States, had resided primarily with their children in Turkey.  *Id.* at 360.  However, after the petitioner-father and respondent-mother got into a heated argument about the father's purported drinking problem, during which the father threatened the mother and told her to leave with the children, the mother and children flew to New York City.  *Id.*  During a layover in Europe, the father told the mother over the phone that she and the children should stay in the United States.  *Id.*  However, two weeks later, the father filed an application with the Turkish Ministry of Justice, seeking the children's return to Turkey, pursuant to the Hague Convention.  *Id.*  At about the same time, a Turkish family court entered a protective order barring the father from threatening or disturbing the mother and the children, and the mother began divorce proceedings.  *Id.* at 360–61.  The father eventually was granted visitation rights by the Turkish family court, which the mother later denied the father.  *Id.* at 361–62.  The father thereafter filed an ICARA action in this District, seeking an order enforcing his visitation rights and directing the mother to return the children to Turkey.  *Id.* at 362.

The Second Circuit, although affirming the lower court's return order, vacated its fees award "because the Mother had a reasonable basis for removing the children to the United States." *Id.* at 375. The Circuit noted that "[a]though mistake of law is not a defense to the return action itself, it is a relevant equitable factor when considering whether a costs award is appropriate" and that the mother's removal of the children to New York did not "run counter to the [Hague] Convention's purpose of deterring child abductions by parents who attempt to find a friendlier forum for deciding custodial disputes." *Id.* at 375–76 (internal quotation marks and citation omitted); *see also id.* at 376 ("The drafters' primary concern was to remedy abuses by noncustodial parents who attempt to circumvent adverse custody decrees (*e.g.*, those granting sole custodial rights to the other parent) by seeking a more favorable judgment in a second nation's family court system.") (quoting *Abbott*, 560 U.S. at 24 (Stevens, J., dissenting)). Following the Second Circuit's opinion, the father filed a renewed application for costs, which the district court denied. *In re S.E.O.*, No. 12 Civ. 2390 (LTS), 2013 WL 4564746 (S.D.N.Y. Aug. 28, 2013). It found that "[a]n award of fees against a party with an objectively reasonable litigation position generally will not promote the purpose of a discretionary statutory fee shifting provision." *Id.* at *2 (citing *Psihoyos v. John Wiley & Sons, Inc.*, No. 11 Civ. 1416 (JPO), 2013 WL 1285153, at *2 (S.D.N.Y. Mar. 29, 2013)).

In *Madrigal*, the district court similarly concluded that the children, residents of Mexico, should be returned to that country, but declined to grant the petitioner-father's request for costs and attorneys' fees. 2015 WL 5174076, at *20. In that case, the respondent-mother and her children were on vacation in Miami when the father filed a divorce proceeding that sought to prohibit contact between the mother and the children. *Id.* at *2–3. After the mother's lawyer suggested that she remain in the United States with the children, the father filed a Hague

15

Convention petition.  *Id.* at *3.  The district court ordered the children be returned to Mexico, but declined to shift fees and costs to the mother for several reasons.  One was the father's conduct in, *inter alia*, filing for divorce while the mother and children were in the United States, which, in the Court's view, "mean[t] that [the father came] before the Court with unclean hands."  *Id.* at *20.  Another was that "while [the mother was] not blameless, there [was] no indication that she [had] retained the Children in the United States with the hope of obtaining a more favorable custody determination."  *Id.*

Finally, in *Rehder*, the parents, who resided in Germany, had a "troubled relationship," and the mother, accompanied by the child, eventually left Germany for Bellingham, Washington. 2015 WL 4624030, at *1.  Before and just after their departure for the United States, the father sent the mother "emotional and volatile communications"—these included "Please respect that I will [have] no further contact anymore" and "[U]se my card and f—ing go to America and never come back."  *Id.* (alteration in original).  The father later stated that, with these communications, he never consented to the child's indefinite stay in the United States.  *Id.*  Later, when the mother began divorce proceedings in the United States, she discovered that her marriage had been a bigamous one, because the father, at the time of marrying the mother, was still legally married to another woman.  *Id.* at *2.  This development led to testimony by a German law expert in the Hague Convention proceeding, to opine on the impact of the bigamous marriage on the father's custody rights.  *Id.*

The district court held that "[a]lthough there [was] sufficient evidentiary support for at least some portion of [the] claimed fees, after careful consideration of equitable principles and pertinent factors in this case, . . . it [would have been] clearly inappropriate to compel the child's mother to pay any of [the father's] attorneys' fees."  *Id.* at *3.  Significantly, the court concluded

16

that, given the hundreds of pages of briefing and series of hearings before the court, as well as

the need for German law expertise, the case was not a "simple case or one that fell 'squarely

within the heartland of the Hague Convention.'"  *Id.*  (quoting *Cuellar*, 603 F.3d at 1143).  The

court further found that the mother had "had a mistaken, but nevertheless good faith belief that

the parties had agreed that she would take [the child] to the United States."  *Id.* at *4.  In so

finding, the court noted the parties' "emotional and volatile back and forth conversations, in

which [the father] would tell [the mother] to leave and take the child with her, but immediately

thereafter change his position and claim that he wanted to work things out."  *Id.*  The Court noted

that although "such back and forth is insufficient to meet the Hague Convention's 'unequivocal

abandonment' standard, the communications between the parties led the court to believe that [the

mother] had a good faith belief that [the father] intended to allow their child to remain in the

United States."  *Id.*

The facts underlying *Ozaltin*, *Madrigal*, and *Rehder* each of course are distinct from each

other and those here.  Indeed, the sad and varied sagas of family dissolution from which Hague

Convention cases arise call to mind Tolstoy's observation that while "[h]appy families are all

alike," "every unhappy family is unhappy in its own way."[6]  But the reasons given for not

shifting legal fees to the respondents in those three cases echo here as well.

Like the respondent in *Ozaltin*, Larson had reasonable bases (two, in fact) for concluding

that it was lawful for him to retain A.R.O. in New York.  First, there was a substantial factual

basis for his claim that A.R.O. had been subjected to (and if returned, would face a resumption

of) serious child abuse—specifically, A.R.O. had reported, Onrust had permitted her then-

---

[6] Leo Tolstoy, Anna Karenina 1 (C. Garnett transl. 1978) (quoted in *Bowen v. Gilliard*, 483 U.S.
587, 633 (1987) (Brennan, J., dissenting, joined by Marshall, J.)).

boyfriend to physically abuse A.R.O. while in her custody in Germany, had herself hit A.R.O., and had refused to respond to the child's complaints about such abuse. Although the parties' settlement mooted the occasion for the Court to resolve whether a return to Germany presented a grave risk to A.R.O.'s physical or psychological well-being, the evidence presented to the Court prior to trial made clear that A.R.O. had been the subject of at least deplorable mistreatment while in Onrust's custody, and that such a defense to ICARA liability was at least colorable. A.R.O. had recounted such abuse, and Onrust did not dispute much of A.R.O.'s accounts. Further, as of the point in September 2014 when Larson declined to return A.R.O. to Germany, Onrust continued to date Peter, whom A.R.O. had accused of seriously abusing him, and indeed continued to see Peter for some time thereafter. It was Peter's later disappearance from Onrust's life, on or shortly before January 2015, that removed the gravest threat of future abuse of A.R.O. (and, the Court perceives, made possible the eventual settlement).

Second, as of early October 2014, Larson had a credible basis to believe that Onrust had relinquished custody of A.R.O. to him. The terms of the parents' custodial arrangement had not been set by any court or government body, but instead by their exchange of emails. No court order was needed to modify their agreed terms. And Onrust, in an October 4 email, told Larson that she "want[ed] to give up all [of her] parental obligations concerning [A.R.O.] and that she "expect[ed] [Larson] to change [their] agreement now in [the] way [she] said . . .   [O]therwise the [Hague Convention petition] [she] made [would] not be taken back." On the basis of that email, Larson could plausibly take the view that Onrust had rescinded her custody rights and consented to Larson's retention and custody of A.R.O. in New York. While the Court might have rejected this defense at trial, Larson, like the respondent mother in *Ozaltin*, had a reasonable basis to believe he had custodial rights to retain A.R.O. in New York. *See also Mendoza v. Silva*,

987 F. Supp. 2d 910, 916–17 (N.D. Iowa 2014) (declining to award fees where court found "that [the father] had a mistaken, but nevertheless good faith belief that the parties had agreed that he would take the children to the United States where they would attend school.").

Like the respondent in *Madrigal*, Onrust came before the Court with unclean hands. She testified during her deposition that she had hit A.R.O. in the past with a belt. She also admitted having learned that Peter had inflicted abuse on A.R.O., but having nevertheless remained in a romantic relationship with Peter. After A.R.O. reported this abuse to Larson during his 2014 summer visit to Larson in New York, Larson retained A.R.O. in New York beyond the agreed-upon deadline. While Larson might or might not have prevailed at trial on his claim to fear future physical and psychological abuse of A.R.O.—the improved state of affairs after Peter left the picture in early 2015 potentially weakened this defense—Onrust's conduct in knowingly exposing her young son to abuse was clearly a catalyst for Larson's earlier decision to hold A.R.O. in New York. A.R.O.'s disability gave Larson more reason to be concerned about his son's vulnerability to mistreatment by Onrust and Peter.

Also as in *Madrigal*, the facts belie any claim that Larson had kept A.R.O. in New York to obtain a more favorable custody determination. On the contrary, the New York Family Court had dismissed Larson's custody proceeding in deference to a German court. Rather, Larson self-evidently retained A.R.O. in New York because Larson lives here and could look after his son.

Finally, like the respondent in *Rehder*, Larson, from October 4, 2014 on, had a basis for a "good faith belief that the parties had agreed that" he could retain the child in the United States. Also like *Rehder*, the unusual facts of this case make it far from a "simple case or one that fell 'squarely within the heartland of the Hague Convention.'" 2015 WL 4624030, at *3 (quoting *Cuellar*, 603 F.3d at 1143).

The Court regards Onrust's application for fee- and cost-shifting as presenting a close and difficult question.  In exercising its discretion, the Court has considered that application carefully.  In so doing, the Court has refreshed its recollection of the parties' ample pretrial submissions, including their joint pretrial order, their anticipated documentary and testimonial evidence, an expert report on German law, and a psychiatric report with respect to A.R.O.

In the end, various factors, in combination, lead the Court to view this as a case, like *Ozaltin*, *Madrigal*, and *Rehder*, where shifting the legal fees and costs of the petitioner to the respondent would be clearly inappropriate.  These include those addressed above—including that Larson had a good-faith basis for concluding that his son would be subject to a grave risk of physical and psychological harm if returned to Germany, and a good-faith basis to believe that Onrust (from October 4, 2014 forward) had ceded custody of A.R.O. to him, overriding their earlier email agreement.

Also significant to the Court is that Onrust and Larson settled this case, on terms memorialized in a thoughtful and detailed consent decree that the parties drafted for the Court's approval.  While the fact of a settlement does not preclude cost-shifting under ICARA, on the facts at hand, where the respondent Larson had real and colorable defenses, it does prevent the Court from finding that, had the case been resolved at trial, petitioner Onrust would surely have prevailed in securing A.R.O.'s return.   For the reasons noted, it is possible that Larson would have prevailed, allowing him to keep A.R.O. in New York and apart from his Germany-based mother.

The Court is also mindful of the significant benefits achieved by the settlement—for the parents, but above all, for A.R.O.  For A.R.O., the settlement secures—among other benefits— extended and defined time with each parent during the year, with meaningful protections to

guard against a recurrence of abuse when A.R.O. is with Onrust in Germany. To enable the settlement to be reached, both parties made important concessions. The Court's view is that it is most accurate to view *both* parties, and A.R.O., as having prevailed. Onrust secured A.R.O.'s return to Germany, and in that respect is properly viewed as prevailing. But Larson—first by retaining A.R.O. while the prospect of his continued abuse loomed in Germany, and then by securing settlement terms that more solidly safeguard his son from physical and psychological abuse—protected his son from harm, and in that real sense prevailed, too. Both parties, and A.R.O., also benefit from the fact that, for the first time, a custodial decree will be in place, clearly delineating each parent's rights and responsibilities and giving the parties an agreed forum to which to turn in the event of future disagreements about A.R.O.'s care and custody.

In the Court's judgment, consistent with the mutual benefits yielded by the settlement, it is right that each party bear its own fees and costs (except as negotiated in the consent decree itself). Shifting Onrust's fees and costs to Larson would wrongly imply that Onrust was the sole winner, whereas in fact, the settlement reflects benefits for, and compromises by, each parent, in A.R.O.'s best interests, which are ultimately most important. *See Mendoza*, 987 F. Supp. 2d at 916 (declining to award fees and costs where court "found it to be a very close case"). The Court therefore exercises its discretion not to order the shifting of fees and costs.

In so ruling, the Court pointedly does not rely on a separate argument made by Larson, to the effect that his financial circumstances would make it clearly inappropriate for the Court to shift any of Onrust's fees and costs to him. Larson attests that he is currently the president of an 18-month-old start-up business, which in 2014 had earnings of about $150,000. Larson Aff. ¶ 6. He further attests that his current pay is about $900 per week and that he does not have savings. *Id.* ¶¶ 6–7. Onrust is skeptical of the latter claim, arguing that if Larson's company has earnings

of $150,000, so must Larson.  Onrust Reply Br. 2.  Larson also notes that, under the parties'

settlement agreement, he already bears certain financial responsibilities for A.R.O.—he is to pay

(or has already paid) (1) any fees incurred in connection with establishing his paternity of

A.R.O., (2) A.R.O.'s travel expenses to Germany and future trips to visit Larson, (3) costs for a

private social worker to assist the family and to monitor A.R.O.'s safety and well-being, and (4)

any legal fees or expenses incurred in registering the consent decree with a court of competent

jurisdiction in Germany.  Larson also has the option to enroll A.R.O. in private counseling in

Germany at his expense, and either party is at liberty to file for child support.

However, these circumstances are not sufficient to persuade the Court that—were shifting

of fees and costs to him otherwise appropriate—Larson should be immune from such shifting.

Larson has certainly articulated sound arguments why imposing the entirety of Onrust's nearly

$140,000 in fees and expenses on him would be financially crushing, and might impede his

ability to make the expenditures he is required to make for A.R.O.'s benefit.  The Court would

have to consider the impact of a specific fee award on Larson's ability in the future to care for

A.R.O.  *See Norinder v. Fuentes*, 657 F.3d 526, 536 (7th Cir. 2011) (noting that "[a]t least two

courts of appeals have recognized that a fee award in a case under the Convention might be

excessive and an abuse of discretion if it prevents the respondent-parent from caring for the

child") (citing *Whallon*, 356 F.3d at 139; *Rydder v. Rydder*, 49 F.3d 369, 373–74 (8th Cir.1995));

*see also Lyon v. Moreland-Lyon*, No. 12 Civ. 2176 (JTM), 2012 WL 5384558, at *2–3 (D. Kan.

Nov. 1, 2012) (denying fees motion where respondent demonstrated "straitened financial

circumstances"); *Vale v. Avila*, No. 06 Civ. 1246 (JBM), 2008 WL 5273677, at *2 (C.D. Ill. Dec.

17, 2008).   But on the facts shown, the Court cannot conclude that some form of payment

arrangement—whether entailing partially deferred payment, or a reduced payment—is

financially out of reach for Larson.  The Court's ruling that a shifting of fees to Larson would clearly be inappropriate therefore does not reflect a judgment that he is unable to pay the sum sought by Onrust.

For the reasons stated, and based on the authorities the Court views as most analogous, the Court denies Onrust's motion to shift her fees and costs to Larson.[7]

## CONCLUSION

For the foregoing reasons, the Court denies Onrust's motion for attorneys' fees and costs. The Clerk is directed to terminate the motion pending at docket number 51, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 10, 2015
New York, New York

---

[7] In light of this ruling, the Court has no occasion to reach Larson's alternative argument that Onrust's claimed fees and costs are excessive to the work reasonably done by her counsel.